IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JOYCE BOIGENZAHN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL CASE NO. 1:25-cv-405-ECM |
| | ) | [WO] |
| JOEBACHI, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

On May 30, 2025, Joyce Boigenzahn (the "Plaintiff") filed suit against Joebachi, LLC (the "Defendant") for sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") (Count I), retaliation under Title VII (Count II), and nonpayment of wages and benefits under the Fair Labor Standards Act ("FLSA") (Count III). (Doc. 1 at 11–16, paras. 52–86).[1]  The Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against "Hibachi Joe's" and received a notice of right to sue letter. (*See* doc. 17-2 at 2; doc. 17-3).  Following proper service on September 16, 2025 (doc. 9), the Defendant failed to plead or otherwise defend. Consequently, on August 25, 2025, the Plaintiff requested the Clerk of the Court enter default against the Defendant. (Doc. 12).  On September 10, 2025, the Clerk of the Court entered default. (Doc. 13).  Later the same day, the Plaintiff filed a motion for default judgment. (Doc. 14).

---

[1] For clarity, the Court refers to the document and page numbers generated by CM/ECF.

Upon the Court's Order for further briefing on the motion for default judgment (doc. 16), the Plaintiff filed a brief outlining each claim and the relief sought. (*See* doc. 17). On Counts I and II, the Plaintiff seeks back pay along with compensatory and punitive damages. (*Id.* at 8–9). For Count III, the Plaintiff seeks back pay, liquidated damages, attorney fees, and expenses. (*Id.* at 9–10).[2] On December 15, 2025, the Plaintiff filed a motion for a damages hearing. (Doc. 18).

After careful review of the Plaintiff's motions and briefing, and for the reasons that follow, the motion for default judgment against the Defendant is due to be GRANTED, and the motion for a damages hearing is likewise due to be GRANTED.

## I. JURISDICTION AND VENUE

The Court finds it has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Personal jurisdiction and venue are uncontested, and the Court concludes that venue properly lies in the Middle District of Alabama. *See* 28 U.S.C. § 1391.

## II. LEGAL STANDARD

A default judgment may be entered when a defendant "has failed to plead or otherwise defend." FED. R. CIV. P. 55(a). While the Eleventh Circuit has a "strong policy of determining cases on their merits" and "therefore view[s] defaults with disfavor," *In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1295 (11th Cir. 2003), it is well-settled that a

---

[2] In her complaint, the Plaintiff sought a broader array of relief, including nominal damages, prejudgment interest, and reinstatement. (*See* doc. 1 at 16–17 paras. 58, 66).

"district court has the authority to enter default judgment for failure . . . to comply with its orders or rules of procedure." *Wahl v. McIver*, 773 F.2d 1169, 1174 (11th Cir. 1985).

"When a defendant defaults, he 'admits the plaintiff's well-pleaded allegations of fact.'" *Giovanno v. Fabec*, 804 F.3d 1361, 1366 (11th Cir. 2015) (quoting *Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1106 (11th Cir. 2015)).  Therefore, "[t]he allegations must be well-pleaded in order to provide a sufficient basis for the judgment entered." *De Lotta v. Dezenzo's Italian Rest., Inc.*, 2009 WL 4349806, at *1 (M.D. Fla. Nov. 24, 2009) (citing *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009)).  A complaint is "well-pleaded" when it satisfies the requirements set out in *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007).  Specifically, "the factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  "[A] formulaic recitation of the elements of a cause of action will not do." *Id.*

Even though a plaintiff may satisfy the pleading requirements, "the Court [still must] determine[] the amount and character of damages to be awarded." *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999).  The court *may*—but is not required to—hold a hearing before entering an award for damages with a default judgment. *See Giovanno*, 804 F.3d at 1366 ("Given its permissive language, Rule 55(b)(2) does not require a damages hearing in every case.").  Indeed, "[d]amages may be awarded without an evidentiary hearing 'only if the record adequately reflects the basis for award via . . . a demonstration by detailed affidavits establishing the necessary facts.'" *Robbie's of Key West v. M/V Komedy III*, 470 F. Supp. 3d 1264, 1268 (S.D. Fla. 2020) (second

3

alteration in original) (quoting *Adolph Coors Co. v. Movement Against Racism & Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985)).

### III. FACTS[3]

In February 2023, Plaintiff began working as a "Business Manager" at Hibachi Joe's and Mikata Japanese Steakhouse, in Dothan, Alabama. (Doc. 1 at 2–4, paras. 7, 11, 21; doc. 17-5 at 2, para. 2). The Defendant operated both establishments. (Doc. 1 at 3, para. 8). Joe Urt Puk ("Puk") owned and operated the Defendant. (Doc. 1 at 3, para. 10; doc. 17-5 at 2, para. 2). As Business Manager, the Plaintiff reported directly to Puk. (Doc. 1 at 4, para. 21).

In January 2023, Puk asked the former Business Manager to "find someone to have sex with him." (*Id.* at 7, para. 30). Puk also told her that because "his wife had a hysterectomy and would not have sex with him, . . . she was fine with him seeking out other partners." (*Id.* at 7, para. 31).

"[O]n a regular basis and throughout [the] Plaintiff's employment" with the Defendant, Puk "made inappropriate comments about [the] Plaintiff's body parts, called [her] during non-work hours, asked [her] to come to his house, showed up at [her] home unannounced, and offered [her] extra money for sexual favors." (*Id.* at 5, para. 23; *see also* doc. 17-5 at paras. 3–5). On one occasion, Puk stated that the Plaintiff's bottom was

---

[3] This recitation of facts is based on the complaint, motion for default judgment, supplemental briefing, and attachments (docs. 1, 14, 17, 17-1, 17-2, 17-3, 17-4, 17-5). *See Ala. Treatment, LLC v. Waste All., Inc.*, 533 F. Supp. 3d 1082, 1087 (M.D. Ala. 2020) ("Besides the pleadings, a court may also consider evidence presented in the form of an affidavit or declaration." (citation omitted)).

4

"perfect." (Doc. 17-2 at 2). The Plaintiff rejected Puk's advances, but Puk persisted, stating, "it's my nature." (Doc. 1 at 5, paras. 23–24).

Puk made similar advances to other female employees. (*Id.* at 5, paras. 22, 24). Puk's miscellaneous acts include: asking female employees and candidates into his office to request sex and, if rebuffed, offering to pay them to find someone else who would (*id.* at 7, para. 33); soliciting a female employee to find him someone to have sex with while delivering catering orders (*id.* at 7, para. 34); informing an employee who was a childhood friend of his daughter that her outfit was "turning him on" (*id.* at 8, para. 36); offering a female employee extra money after missing work in return for sexual favors and, when rejected, stating "if you want more, you know what you have to do" (*id.* at 7–8, paras. 34–35); and threatening employees that they would "'get[] deported'" if they complained about him (*id.* at 6, para. 29). "All female employees were uncomfortable working around Mr. Puk because of his . . . comments and requests for sexual favors." (*Id.* at 8, para. 37).

In April 2023, the Plaintiff reported Puk's conduct to Puk's financial advisor, Blake Daughtry ("Daughtry"). (*Id.* at 5, para. 25). Puk was alarmed by the Plaintiff's action and told her to stay home for several days with pay and apologized. (*Id.*).

In May 2023, Puk began calling the Plaintiff "too old," "useless," and "worthless." (*Id.* at 6, para. 27). Around that time, Puk began asking female interview candidates about their marital status and relationship satisfaction. (*Id.* at 6, para. 28). Then, Puk attempted to sexually assault a female colleague of the Plaintiff when the two were alone. (*Id.* at 6, para. 29). Security footage provided to police showed Puk naked below the waist at one of the Defendant's restaurants while the colleague was present. (*Id.*).

5

In July 2023, Puk began calling the Plaintiff late at night and requesting she visit his house. (*Id.* at 9, para. 42). He also went, uninvited, to the Plaintiff's home three times. (*Id.*). Later that month, Puk specifically told the Plaintiff, "if she ever needed extra money" he would pay her for "personal time." (*Id.* at 9, para. 43). "Puk confirmed that 'personal time' meant sex." (Doc. 17-2 at 2). The Plaintiff again refused his advances. (Doc. 1 at 9, para. 43; doc. 17-2 at 2).

In late August 2023, Puk called and texted the Plaintiff, requesting she visit his house. (Doc. 1 at 9, para. 45). After the Plaintiff did not respond, Puk terminated her the following Monday even though she had "no performance issues." (*Id.* at 10, para. 46).

On October 6, 2023, Daughtry called the Plaintiff, telling her that Puk was sorry and wanted to meet to discuss her return to work with a raise and the possibility of remote work. (*Id.* at 10, para. 47). The Plaintiff obliged and went to meet with him. (*See id.*). At the meeting, Puk stated no positions were available but that he would pay her for "personal time." (*Id.*). The Plaintiff left and filed a police report. (*Id.* at 10, para. 48; doc. 17-2 at 2).

Puk responded, blaming his female employees and stating that they were having consensual relationships with him and accepting gifts. (Doc. 1 at 10, para. 47). Puk "stated these allegations in order to cover up his own [conduct] against female employees." (*Id.* at 10, para. 49). Puk also variously told the Plaintiff's potential employers that she was still employed with the Defendant or had stolen money from him, hampering her ability to find a job. (*Id.* at 10–11, para. 50; doc. 17-5 at 4, para. 8).

On November 28, 2023, the Plaintiff filed a charge of discrimination with the EEOC against the Defendant. (Doc. 1 at 3, para. 13; *see* doc. 17-2 (charge of discrimination)).

6

Despite obtaining an extension of response deadlines, the Defendant apparently did not successfully respond to the Plaintiff's charge. (*See* doc. 17-4). On February 25, 2025, the EEOC issued a determination letter, finding "reasonable cause to believe [the Defendant] discriminated and retaliated against the [Plaintiff] due to her sex and retaliation in violation of Title VII." (Doc. 17-1 at 3). On March 10, 2025, the EEOC sent a notification to the parties that it could not obtain a settlement for the Plaintiff and provided a notice of a right to sue within ninety days of receipt. (*See* doc. 1 at 4, para. 15; doc. 17-3 at 2). On May 30, 2025, the Plaintiff timely filed suit. (*See* doc. 1).

The Plaintiff was "embarrassed and humiliated" because of Puk's behavior; she had lost her job and prospective job opportunities. (Doc. 17-5 at 4–6, paras. 8, 10, 13). Working with the Defendant caused her stress, leading her to "thr[o]w up almost every day," lose weight, and suffer hair loss during her tenure. (*Id.* at 3, para. 6). To date, the Plaintiff suffers from post-traumatic stress disorder born of her employment with the Defendant. (*Id.* at 4, para. 6). Further, because she still lives in Dothan, Alabama, the Plaintiff fears that Puk "will try to sabotage [her] business," her own restaurant. (*Id.* at 5, para. 12).

Additionally, while employed with the Defendant, the Plaintiff was a salaried employee with a weekly pay of $700.00. (Doc. 1 at 15, para. 69). However, "[f]or at least three years prior to filing [her] complaint, [the] Defendant did not pay [the] Plaintiff for all hours she worked over [forty] hours a week." (*Id.* at 4, para. 16). The Plaintiff worked twelve hours a day, Monday through Friday (sixty hours a week). (*Id.* at 14, para. 69). The Plaintiff also worked weekends at special events with tip-only compensation paid at Puk's discretion. (*Id.* at 14, para. 71; doc. 17-5 at 4, para. 7). Puk would dock the Plaintiff's

7

salary "if she was late, left early or took a lunch break or break during her shift," leading her to make less than her salary. (Doc. 1 at 14, paras. 70, 72). Because of Puk's practices, the Plaintiff "usually worked anywhere from [ten to twenty] hours [overtime] that [she] was not compensated for." (Doc. 17-5 at 4, para. 7). Records for the precise hours of unpaid overtime do not exist because Puk deleted employees' hours that required overtime pay from the Defendant's payroll system, (*id.*), and when confronted, told the Plaintiff that "it was an error with the payroll company," (doc. 1 at 14, para. 70).

## IV.  DISCUSSION

### A.  Title VII Sex Discrimination: Count I

Under Title VII, it is "an unlawful employment practice" for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). One mode of actionable sex discrimination under Title VII is the creation of a hostile work environment. "A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quotation omitted).

A hostile work environment claim requires that the Plaintiff demonstrate the following: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment to which she was subjected was based on a protected characteristic; (4) the harassment was so severe or pervasive as to alter a term, condition, or privilege of her employment; and (5) the Defendant was responsible for the hostile work environment under a theory of vicarious or direct liability. *Copeland v. Ga. Dep't of Corr.*,

8

97 F.4th 766, 774–75, 781 (11th Cir. 2024) (citing *Bryant v. Jones*, 575 F.3d 1281, 1296 (11th Cir. 2009); *Miller v. Kenworth of Dothan*, 277 F.3d 1269, 1278 (11th Cir. 2002)).

Taking the elements in order: First, the Plaintiff has established she belongs to a group protected under Title VII. *See* 42 U.S.C. § 2000e-2(a)(1) (prohibiting discrimination on the basis of sex).

Second, the Plaintiff has shown that she was subjected to unwelcome harassment, namely: derogatory remarks, uninvited calls and visits to her home, and unwelcomed requests for sexual favors in exchange for payment.

Third, the Plaintiff has shown that the harassment was based on her sex. Drawing from the Court's "judicial experience and common sense" in this context, the admitted facts[4] show that the harassment was sex-based. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citation omitted); *see also Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (en banc) ("[W]orkplace conduct cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context . . . ."). Before the Plaintiff's tenure as the Defendant's Business Manager, Puk told her predecessor to find him "someone" to have sex with and that he was not having sex with his wife. (Doc. 1 at 7, paras. 30–31). In context, "someone" meant a female person. The admitted facts further provide that Puk would solicit female employees and interview candidates for sex. He asked female interviewees about their relationship status and the quality of their relationships. On one

---

[4] The complaint contained a number of conclusory allegations and legal conclusions. (*See, e.g.*, doc. 1 at 5–6, 8, 10–11, paras. 22, 26, 30, 37, 49, 51). The Court does not consider these conclusory allegations and legal conclusions as admitted. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Nishimatsu Const. Co. v. Hou. Nat'l. Bank*, 515 F.2d 1200 (5th Cir. 1975) ("The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.").

occasion, Puk apparently attempted to sexually assault a female employee at work. He called the Plaintiff several times and showed up to her home unannounced on three occasions, offered to pay her for sex, and demeaned her when she denied his April 2023 requests. Later, in August 2023, when the Plaintiff rejected similar advances, the Defendant terminated her soon thereafter, even though she had no performance issues.[5] The Defendant has not offered a nondiscriminatory reason for the Plaintiff's termination, and Puk's proffered reasons—based on the admitted facts—were pretextual, "to cover up his own [conduct] against *female* employees." (Doc. 1 at 10, para. 49 (emphasis added)). On October 6, 2023, Puk requested a meeting with the Plaintiff under the false pretense of rehiring her and again solicited her for sex. In sum, these facts demonstrate that Puk's harassment of the Plaintiff was based on her sex.

Fourth, as illustrated above, the harassment severely and pervasively affected the condition of the Plaintiff's employment.

> To be sufficiently "severe or pervasive," the employer's actions "must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s] . . . to be abusive." *Miller*, 277 F.3d at 1276. "In evaluating the objective severity of the harassment," we look to the totality of the circumstances, including: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.*

*Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 837 (11th Cir. 2021).

---

[5] The Plaintiff does not provide precise dates. However, the record indicates that the rejection of Puk's advances and her termination occurred in close temporal proximity.

Subjectively, Puk created a work environment where the Plaintiff suffered "severe emotional distress, embarrassment, and humiliation." (Doc. 1 at 11, para. 51). A reasonable person would suffer the same by being incessantly pestered by a superior for sexual favors at work and home, derided and harassed further for declining, and subjected to working in an environment where female employees were subject to overt advances for sex—and on one occasion, sexual assault. In other words, Puk's conduct was frequent, severe, and both physically threatening and humiliating. Puk's harassment also unreasonably interfered with job performance; resistance to Puk's advances led to the Plaintiff's termination as discussed *infra* Part IV(B).

Lastly, the Defendant was responsible for the hostile work environment. Indeed, because the Plaintiff suffered tangible employment action by her supervisor related to the harassment—firing by Puk—the Defendant is vicariously liable. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 760–65 (1998); *see also Miller*, 277 F.3d at 1278 ("The employer will be strictly liable for the hostile environment if the supervisor takes tangible employment action against the victim." (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998))).

Accordingly, because the Plaintiff has established the elements of a hostile work environment claim, she is entitled to default judgment on Count I.

**B.     Title VII Retaliation: Count II**

To prove a retaliation claim, "the plaintiff must show that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) there was a causal connection between the two events." *Gooden v. Internal Revenue Serv.*, 679 F.

App'x 958, 968 (11th Cir. 2017) (per curiam) (citing *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012)).  "In the retaliation context, an action is materially adverse when it is 'harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 967–68 (alteration in original) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "A plaintiff establishes a causal relation by 'prov[ing] that the protected activity and the negative employment action are not completely unrelated.'" *Id.* at 968 (alteration in original) (quoting *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)).

Title VII prohibits retaliation by an employer against an employee for "oppos[ing] any practice made an unlawful employment practice by this subchapter, or . . . ma[king] a charge, . . . or participat[ing] in any manner in an investigation, proceeding, or hearing under this subchapter. 42 U.S.C. § 2000e-3(a).

Here, the facts demonstrate the Plaintiff was first retaliated against by the Defendant when she told Puk's financial advisor Daughtry in April 2023 about Puk's sexual advances towards her and other female employees.  Puk, though initially apologetic, began to demean her upon her return to work, calling her "too old," "useless," and "worthless" in May 2023.  The Plaintiff has shown that her opposition to the Defendant's unlawful employment actions—sex discrimination—was not completely unrelated to these statements as they began after she reported Puk's conduct to Daughtry.  Puk's statements, however, do not rise to the level of a materially adverse employment action because they were not the kind of statements that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Monaghan v. Worldpay U.S. Inc.*, 955

F.3d 855, 862–63 (11th Cir. 2020), and thus cannot sustain a retaliation claim. *Cf. Thibodeaux v. City of Atlanta*, 2025 WL 2505600, at *1, 5 (11th Cir. Sep. 2, 2025) (per curiam) (holding that coworkers' actions, among other things, of "spread[ing] false rumors that [the plaintiff] had HIV and COVID-19 and had slept with a coworker's boyfriend, and later call[ing] her a 'piece of shit'" after the plaintiff's sexual harassment complaint, were not "sufficiently adverse" to support a retaliation claim).

However, shortly after the Plaintiff rejected Puk's sexual advances, he terminated her employment. The Plaintiff has demonstrated that this firing was not completely unrelated to her opposition to the Defendant's discriminatory employment practices due to the close temporal proximity of the opposition to the Defendant's unlawful employment practices and the termination and the pretextual reasons proffered by Puk for the termination. Moreover, firing is a kind of action that would dissuade a reasonable worker from opposing such practices. *Cf. Ellerth*, 524 U.S. at 761 (noting "firing" as a tangible employment action).

Finally, the Defendant retaliated a third time against the Plaintiff after she filed EEOC charges—by reaching out to other prospective employers and making statements to them to dissuade them from hiring the Plaintiff. Here, the Plaintiff has shown a causal connection, and such action is the kind that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Monaghan*, 955 F.3d at 862–63. Accordingly, the Plaintiff has demonstrated she was retaliated against by the Defendant under 42 U.S.C. § 2000e-3(a), and she is entitled to default judgment on Count II.

C.    **FLSA Claim: Count III**

To recount several pertinent facts: The Plaintiff was a salaried employee working as a "Business Manager" with a base weekly pay of $700.00. She worked twelve hours a day, Monday through Friday but was not compensated for all of her work above forty hours or for work on special events. Puk docked the Plaintiff's pay for a variety of reasons throughout her tenure, leading her to make less than her salary.

Under 29 U.S.C. § 207(a):

> [N]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

However, 29 U.S.C. § 207 does not apply to "any employee employed in a bona fide executive, administrative, or professional capacity" including those at "retail or service establishment[s]" who devote forty percent or more of "hours worked in the workweek . . . to [executive or administrative] activities." 29 U.S.C. § 213(a)(1). Here, the Plaintiff was "[a]t all times material to this action, . . . employed by [the] Defendant as its Business Manager." (Doc. 1 at 3, para. 11). Her employment activities were presumably mostly managerial in nature. Moreover, at the time the Plaintiff had been terminated by the Defendant, the Code of Federal Regulations stated "[t]o qualify as an exempt executive, administrative or professional employee under section 13(a)(1) of the Act, an employee must be compensated on a salary basis at a rate of not less than $684 per week." 29 C.F.R.

541.600(a) (Oct. 6, 2023); *cf.* 29 C.F.R. 541.600(a)(1) (noting the present rate as $1,128 per week). The Plaintiff's salary was $700.00 weekly—meeting the threshold for the exemption. (Doc. 1 at 15, para. 69). Nevertheless, the exemption does not apply where the "the salary basis of pay [is] violated" by the docking of pay for partial days' absences.[6] *Friedman v. S. Fla. Psychiatric Assocs., Inc.*, 139 F. App'x 183, 185 (11th Cir. 2005); *see also Avery v. City of Talladega*, 24 F.3d 1337, 1342 (11th Cir. 1994).

Indeed, the admitted facts establish that the Plaintiff's pay was reduced for partial absences during the workday, reducing her overall compensation. Further, on any given week, the Plaintiff worked sixty-hours and was compensated for, at most, forty hours a week. The Plaintiff further establishes that she usually worked ten to twenty hours of uncompensated overtime per week. (*See* doc. 17-5 at 4, para. 7). Accordingly, the Plaintiff has demonstrated that the Defendant violated the FLSA, and she is entitled to default judgment on Count III.

## V. DAMAGES

On Counts I and II, the Plaintiff seeks backpay and compensatory and punitive damages. (Doc. 17 at 8–9). On these counts, the Plaintiff seeks $61,967.85 in back pay. (*Id.* at 8). For Count III, the Plaintiff seeks unpaid wages, attorney fees, costs, and expenses. (*Id.* at 9–10). For FLSA purposes, the Plaintiff has calculated her backpay at ten hours overtime to $7,700.00 and $15,400.00 in liquidated damages. (*Id.* at 9). She

---

[6] In any case, "[t]he employer bears the burden of proving the availability of the executive exemption," and here it has not done so. *See Avery*, 24 F.3d at 1340 (citing *Atlanta Pro. Firefighters Union v. City of Atlanta*, 920 F.2d 800, 804 (11th Cir. 1991)).

15

calculated twenty hours overtime to $15,400.00 and $30,800.00 in liquidated damages. (*Id.* at 9). The Plaintiff seeks $20,000 in attorney fees and expenses. (*Id.* at 10).

The Plaintiff has not supplied sufficient evidence to demonstrate her entitlement to damages in any of these precise amounts. Nor has she provided information on how these amounts were calculated. Further, she fails to explain the discrepancy or delineation between the separate requested backpay amounts for the Title VII and FLSA violations. Because the Court needs additional information on these amounts and support for compensatory and punitive damages for the Title VII violations, the Court declines to award them here and finds the motion for a damages hearing (doc. 18) is due to be GRANTED. *See Claret v. Toscana Pizza & Grill, LLC*, 2024 WL 4665401, at *2 (S.D. Fla. Nov. 4, 2024) ("[T]he declarations in Plaintiffs' affidavits about the amounts they believe they are owed, without explanation as to how they calculated those amounts, are too conclusory to provide a basis to award damages."); *PNCEF, LLC v. Hendricks Bldg. Supply LLC*, 740 F. Supp. 2d 1287, 1294 (S.D. Ala. 2010) ("Rather than merely *telling* the Court in summary fashion what its damages are, a plaintiff seeking default judgment must show the Court what those damages are, how they are calculated, and where they come from . . . ." (emphasis in original)).

## VI. CONCLUSION

For the reasons stated, and for good cause, it is

ORDERED as follows:

1. The Plaintiff's motion for default judgment (doc. 14) is GRANTED.

2. The motion for a damages hearing (doc. 18) is GRANTED.

3. An evidentiary hearing on damages is SET for **April 30, 2026,** in Courtroom 2A, the Frank M. Johnson, Jr. U.S. Courthouse, Montgomery, Alabama at **1 p.m.** The Plaintiff shall be prepared to address the deficiencies identified herein, *supra* Part V. The Clerk of the Court is DIRECTED to provide a court reporter.

4. The Plaintiff shall file supplemental briefing, **on or before April 13, 2026,** addressing (1) the amount of damages (for *each* claim), attorney fees, expenses, and costs sought; (2) calculations for those damages, fees, expenses, and costs; (3) affidavits and record evidence to support the calculations and amounts offered; and (4) authority for the Court to award the damages, fees, expenses, and costs sought.

5. The Clerk of the Court is DIRECTED to mail this Memorandum Opinion and Order to the address reflected on the docket for the Defendant.

DONE this 12th day of January, 2026.

       /s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE